Ms. Rettmeyer. Ms. Guadnolo. May it please the court and council. Good morning, my name is Rosemary Guadnolo and I represent the plaintiff's appellants in this case. Could you be sure to speak up? I don't know what that thumping is, but we would rather hear you. Is that better, your honor? Okay, fine. So we're here on the issue of whether this debtor should have been granted a discharge in bankruptcy and it arises from facts that are somewhat different than the great majority of discharge cases that come before the courts. So, I mean, we are familiar with those facts and that this requires the look back, but I'll tell you what concerns me most about your side of this case, and I believe must have concerned the district court judge, if you look at the way he phrased so many things, is the standard of review. I don't have any doubt at all reading your brief that a rational person could find that this discharge was inappropriate, but that's not quite the question before us. Where there were conflicts in testimony about whether she intended to conceal anything, for instance, with the property ownership, and the stock is a different issue. Well, the district court's analysis of that is not necessarily the end of the story. Yes, the district court phrased it that the bankruptcy court's conclusions were permissible, although a reasonable person could reach a different permissible conclusion. But that still preserves the issue of whether or not the bankruptcy court's... Oh, I understand that, but I guess particularly with the ownership of the property and stock ownership, a version of the story is presented that if you believe it would mean that she wasn't trying to hinder or delay or defraud anybody. She was just confused in the one instance about the difference between who holds the title and who's on the note, and in the stock ownership instance and the difference between assignment and full-blown transfer. So perhaps moving to the income from employment, if she didn't even open this bank account until after the bankruptcy was filed, doesn't that take care of that one, too? Well, the evidence does not indicate that. I mean, that came later during the hearing before the bankruptcy court when confronted by the fact that she earned income from this employer, Cytec, in 2010. Now, you cite in your brief, here's a part of your case that I think needs answering. You asked her about this Cytec income, and she testifies that she got some in 2010 and she got some in 2011. She gives amounts. And as I'm remembering, you asked her, what did you do with those checks? And she said, I deposited them. And so then the question is, where were they deposited? Apparently they weren't deposited in this old second account if it wasn't even open until the very end of July of 2011. People, even under the UCC, you don't sit around and sit on a check for more than six months without putting it in the bank. So I gather that your point is there has to have been a bank there someplace, and she never told anybody about it. Well, we didn't know about the existence of the old second account that was apparently opened in July of 2011. During the trial, there was a question, we were leading up to the point of, and we know she had the 2010 income because there it is on the bankruptcy schedules. And you never got a 2010 tax return either? No, no. To this day? To this date. May I just add to all of this, because these are all my questions as well. We have to say that the bankruptcy court, that it was clear error for the bankruptcy court to disbelieve all of this. And that's our hurdle, and if you could. Of course it is. Of course it's a high hurdle, but the hurdle remains there to be jumped by those who would attempt to do so. Here, it's not just one asset. You have several assets, and you have some very fragrant explanations to meet all of them. Clearly erroneous, sure it's high, but if there's no substantial evidence to support the conclusions, the findings of the bankruptcy court, this court is well within its province of saying that's clearly erroneous. And we have some almost backflips by the bankruptcy court to rope in these explanations. I mean, we have the explanation of why she didn't disclose the ownership of the home. And the court let in the fact that she called the bank, Chase, I think, and they wouldn't talk to her. I mean, this kind of stuff should not have been admitted, and even if admitted, should have been given. Well, sometimes odd things happen, and people's lives are weird, and banks may say odd things. Let me ask you this, Ms. Guadagnolo. Is there any indication that the bankruptcy judge considered Ms. Redmire's continuing duty to disclose income and bank accounts after the examination occurred during the, pursuant to the citation of assets? Precisely the opposite, Your Honor. It seemed that- And isn't that a legal error? Of course, it would be a legal error, and that's part of the problem here, that the continuing nature of the citation, I don't know if it was just possible lack of familiarity, but we certainly tried to beat the point home that this is continuing. And there was a focus by the bankruptcy court, as well as the district court, as to what Ms. Redmire knew, understood, was aware of, remembered, at the initial November 2010 examination. But up until late February, when the trial court in DuPage County ordered a response to, oh, it was a rider that we were telling the court, this is what we get. You had a series of what we would call motions to compel. Boy, did we ever. And as late as February, the end of February, these items were still under wraps. There was still no disclosure. Somehow between the end of February and the end of June, the light of truth dawned on Ms. Redmire, and everything in the schedules appears to be correct. Well, that was what got you into this one-year look back, as I understood it. She realized that you have to be honest before the bankruptcy court in your schedule, so she puts everything down, and you looked at it and said, where did this come from? I think she had the obligation to be equally honest. In the state court proceedings, after all, I suppose we can speculate, just for a moment, that if she had concealed these assets in her bankruptcy schedules, we wouldn't be here right now. I mean, that bankruptcy would be gone, or she would be denied a discharge. It just seems to me that the integrity of the state supplemental proceedings should be accorded that same deference, and it just didn't happen here. What we have is a raft of excuses. It does strain credulity to think that she was paid a substantial sum, maybe $13,000 in 2010, and somehow never got deposited anywhere. It does appear that at the hearing, that the debtor- Which hearing are you talking about? For the bankruptcy court. You know, of course, none of us were there, but throughout, I've been wondering, I don't know, this is probably not a fair question, but is she a particularly synthetic person? No. No. She is a- The other side will get rebuttal time on that issue, so. As parts of the transcript will indicate, there are times when asked a question, you know, there would be torrential answers that at times did preclude the objection that should have been made at the time, but it's in keeping with someone who was in the business of her business that I don't think that the bankruptcy judge found her to be sympathetic. I know the trial court in DuPage definitely did not, but I also think that the bankruptcy court, perhaps just leery of treading on this well-articulated principle of law that you have to lean in favor of the debtor, this was a lean that wound up being at about 180 degrees. I'm in my rebuttal time, Your Honor. You may save the rest of your time for rebuttal. Thank you. Mr. McTavish. May it please the court, counsel. My name is Alex McTavish. I represented the debtor in this case. So Mr. McTavish, the part of this case that concerns me the most is the income from employment. Okay. As I was indicating, you know, I can see how a finder of fact, first the bankruptcy court, then affirmed by the district court might have gotten where they got on the title to the property and on the stock ownership, but I'm really having trouble with this income from SciTech. Okay. There's two aspects of the income. There's the any income prior to the citation examination and any income or documents relating to income after. So I look at it as, was there any 2010 income that would have been, it has to have been reflected either on a W-2 or a 1099, depending on what. Well, the bankruptcy court specifically found that the creditor had failed to show that she had been paid by SciTech prior to the examination. But no, but why do we care about prior to the, Judge Hamilton pointed out, there's an ongoing duty in citations to discover assets. If you get an inheritance in the middle of it, you have to tell the court about that. That's the process would break down if you got to clam up the day after. The actual citation says that you are commanded to produce at the examination documents pertaining to. Right, and she failed to comply with that. It was incomplete, correct? She brought her tax- She failed to comply with that. She didn't bring everything. And so it was continued, right? It was continued only for the production of four categories of documents. One, her documents pertaining to her mortgage, documents pertaining to her car loan, documents pertaining to a closed bank account at American Chartered Bank, and a judgment that was entered against her by American Express. So you're saying it was not continued and kept open with respect to income? No, it was not, Your Honor. There's a backdrop of Illinois law on this, though. I mean, that's what I, I mean, you seem to think that if the judge  the entire body of Illinois law on citations, that somehow it was off the table. If she had gotten a job, let's suppose she'd gotten a very well-paying job on February 1st, 2011, and she was bringing home $20,000 a month or something. As far as your theory of the case is, she doesn't have a duty to tell anybody about that income. Well, where does she find out? Assuming that such a duty exists, you not only have to have that duty, and that's maybe Illinois law, but in order to deny her a discharge. She's represented, for one thing. Her lawyer should be telling her this. Well, her lawyer should be or shouldn't be, I don't know what happened. There's no evidence. You say, I mean, he's present. Doesn't he have a duty to chime in? For instance, when she states that she doesn't have any interest in the Lorack and Sire shares, he hears. You're absolutely correct, Your Honor. Had he chimed in, and you might have chimed in, and I might have chimed in, and said, wait a minute, I'm not so sure that answer is correct. We'll check it out and get back to you. He did not. But then there's more. There's more. There's a part of the citation that addresses what she's supposed to bring with her to the examination, but then your opponent has on page six, you are prohibited from making or allowing any transfer or other disposition interfering with any property not exempt until further order of the court or the termination of the proceedings, and so on. There's language that says, don't alienate your money while this is outstanding. But there's no evidence that she made any such transfers. Well, I'm sorry, I thought she testified. That wasn't part of the complaint. She testified she earned money from Scitech, and she doesn't tell anybody where she puts it. She doesn't tell anybody where it went. It just vanished in midair, I guess. I get back that if she had an obligation, I think she has to know that she has that obligation. And I'm saying that language from the citation reads to me like, don't get rid of any money without telling us about it. She may have had legitimate defenses to being asked to contribute some or all of that money. There may have been personal exemptions. I don't know. There are a lot of things in state law. Well, I go back to the- That's very problematic. In order to deny her discharge, you have to show not only that she had the obligation, but she knew she had the obligation, and that she specifically failed in that obligation with the intent to hinder and delay her creditor. She was represented by an attorney in this entire process. There was no evidence as to what he may or may not have told her regarding her obligations. I mean, people hire a lawyer, and they expect the lawyer, frankly, to tell them what to do. So no one should ever hire a lawyer, because then they will never have to turn any money over at these examinations. That's the lesson I'm taking. There go our jobs. The thing that bothers me is this. The district court cited a lot of cases for the proposition that it had to defer to the factual findings of the bankruptcy judge when it credited one person's testimony after another. But here, we don't have a question of competing testimony, because her testimony was, well, it wasn't competing with another party's. It was competing with itself. I mean, she testifies that she opened a checking account shortly after she was paid by SciTech. She also testifies that she had no checking account. Many of her scenarios are just not facially plausible. She was obviously confused about the checking account. She was asked- But how can you be confused about a checking account? This isn't high finance. You either have a checking account or you don't. She said she opened a checking account at the old Second National Bank of Aurora. But she didn't ever say where the checks from SciTech went. First, she said it was to Old Second, but then it turns out that's not correct. So there must have been another account, right? I don't know that, Your Honor. Well, what account did she deposit them into? I don't know. I don't know if she deposited, she may have cashed them. She said she did, though. Let me go back, if I could, Mr. McTavish, to a question I asked counsel for the plaintiffs. Is there any indication that the bankruptcy judge, in evaluating these issues, looked at this continuing duty to disclose income after the examination occurred? I don't think there was evidence in the case for him to... He did specifically look at the income prior to this. He does not specifically state in his decision that one way or another. If one is looking for evidence of intent to hide, to defeat creditors, then concealing what you're doing with ongoing garnishable income would seem to be pretty central to that, right? If she knew that she had the obligation to disclose, she still has to... She may have been wrong, she may have had an obligation, but in order to die, it's not sufficient simply to say that she failed in her obligation. She has to know, and she has to have a specific intent. Counsel, I understand your point, but the question is whether the bankruptcy judge, appreciated the precise issue having to do with the continuing duty and what to infer from her failure from, in essence, the beginning of November, 2010, until she filed her bankruptcy petition on the eve of the latest hearing in state court. There's no indication in the decision, and that's the only basis that I can express. You know, maybe she has a case against Mr. Tibble, I don't know, but he certainly understood she had an ongoing obligation. I mean, there's no more basic concept that a lawyer has to communicate. But don't you... You have to come clean about all of your assets. How would she know that? I mean, how does... Because the citation itself says produce records of income and employment. At the examination, these records don't exist at the time of the examination. Obviously they did. She was being paid by then. She had an account, even if none of us seems to know where it was. She testifies that she opened a checking account in 2010, shortly after she got her first check from SciTech. So she either had a checking account as of November 4th, 2010, and lied about its existence at the citation examination, or she had an obligation to produce documents relating to it under a continuing duty to update. And I don't know which it was. The schedules that were filed in the bankruptcy that she signed say there's one closed account at American Chartered Bank that was closed in July 2010, and there were no other bank accounts. So what did she do with the checks she received from SciTech in 2010, 2011? I don't know, but she may have cashed them and used the money for her expenses. She didn't have a large amount of money in a bank account or in some other... This is a pretty big gap in the record. It really seems to me that the clearly erroneous rule operates only if the court has a correct understanding of the law, a finding of fact based on an incorrect standard of the law is automatically clearly erroneous, and you have to have all of the relevant facts there. So if you're saying, well, she took the checks and went off to a currency exchange, which by the way is not what she said or what she did with them, that's still a problem. Well, you can't separate her testimony that she put them in the account when the next question was, where's the account? And the account was at the old Second National Bank, and that account didn't exist until a month after she filed the bank. Which is why her testimony is incoherent on this point. I mean, can you reconcile it for us? I can reconcile it for myself in that she was confused. She signed a set of bankruptcy schedules that she had no other account. In November of 2010, she said very, very clearly that she was depositing paychecks, right, into a checking account, right? Or did I confuse that with the bankruptcy trial? To me, you can't separate the depositing of the checks from where they got, where she said, you can't take half her testimony and say there's an account and ignore the other half of that sentence, which was that it's at the old Second National Bank. But we know your whole position in the post-trial proceedings in the district court was that that second, old second account wasn't opened until about six, seven months later, right? The summer of 2011. The banker provided the affidavit to that effect. Correct. So we've got eight months or so of, eight or nine months of salary. That's untraceable, right? Well, I don't know what happened to her. She had no, she had no accounts that she, she reported no accounts on her bankruptcy schedule. So I can't speculate as to what happened there. All I can reiterate is that as far as the discharge and the discharge standard, I don't know that you can say that she, if she had this continuing obligation, that she appreciated that continuing obligation and specifically flaunted it or failed to comply with it. So, thank you. Okay. Thank you very much, Mr. McTavish.  In brief, Your Honor. She had an attorney. There's no such thing as constructive intent, but there sure is something called constructive knowledge. Her attorney could have, should have, maybe did tell her exactly what was required of her. When the first examination took place in November of 2010, the citation was kept open to allow her to comply. It was never limited to any documents. It just kept going. That's the way it works. The- Did anybody ever say to her, you know, keep us posted about changes in your economic situation or anything like that? Well, the nature, there was communication with her attorney, of course, while this was all going on, but the orders continued the citation to allow her to comply, which she never did. The, finally, when she was required in February- And she was supposed to give the tax returns. Of course, she wouldn't have had her 2010 tax return in November of 2010. No, but she certainly would have by the end of June of 2011, and that never, ever surfaced, nor did a W-2 for the 2010 income. The four areas that she responded to for the rule-to-show cause that was leading up to a rule-to-show cause, she responded as to four different categories, but those were in response to our continuing pressure to compel. We did not limit it to those four areas. We were concerned that she was disclosing at least that and perhaps a lot more. At the trial before the bankruptcy court, when she admitted that she had a checking account in 2010, great, that's an admission. That should be enough for the court to deny a discharge, notwithstanding all the other elements. And we asked where it was. The important thing was she admitted she had a checking account in the year 2010. So then we go to the post-trial motions. We had to file a motion to amend the complaint to include that as required by law. And here she goes and she files these quasi-affidavits that she finally got right as to form, saying, nope, it wasn't dull second. It was something, that wasn't open until July of 2011. Why should the bankruptcy court have thought that of any relevance? That where it was was not relevant. It's that it was that was relevant. And she basically was allowed to reopen the proofs. Could we then come forward and cross-examine her further as to, well, if you didn't deposit it into that account, where did you deposit it? Didn't have to do that at trial because she told us where she deposited. That was a reopening of proof and just kind of the final straw that showed that the bankruptcy court was really, really straining. And we hope that this court will come away with the definite conviction that a mistake was made. Thank you. All right, thank you very much. Thanks to both counsel. I take the case under advisement.